LUCERO, Circuit Judge.
Gray Peterson, a resident of Washington, applied for a concealed handgun license (“CHL”) from the ex officio sheriff of Denver, Colorado. Pursuant to state law, Colorado sheriffs may issue CHLs only to state residents. Colo.Rev.Stat. § 18-12-203(l)(a). Peterson’s application was accordingly denied, prompting Peterson to file suit against the Denver sheriff and Colorado’s executive director of the Department of Public Safety. Peterson claims that Colorado’s policy with respect to non-resident CHL applicants violates the Second Amendment, the Privileges and Immunities Clause of Article IV, and several other constitutional provisions.
The district court concluded that the executive director of the Department of Public Safety is entitled to Eleventh Amendment immunity because he has no connection to the enforcement of the challenged statute. We agree with that conclusion. Colorado law requires “each sheriff to implement and administer” the CHL licensing scheme. Colo.Rev.Stat. § 18-12-201(3). Because sheriffs are responsible for administering the state’s CHL regime — not the executive director of the Department of Public Safety — Peterson’s claims against the latter do not fall within the Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), exception to Eleventh Amendment immunity.
With respect to Peterson’s claims against the Denver sheriff, we conclude that the carrying of concealed firearms is not protected by the Second Amendment or the Privileges and Immunities Clause. In Robertson v. Baldwin, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897), the Supreme Court stated in dicta that “the right of the people to keep and bear arms is not infringed by laws prohibiting the carrying of concealed weapons.” Id. at 281-82, 17 S.Ct. 326. More recently, in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Court noted that “the majority of the 19th-centu-ry courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues,” and explained that “nothing in our opinion should be taken to cast doubt on longstanding prohibitions.” Id. at 626, 128 S.Ct. 2783. In light of our nation’s extensive practice of restricting citizens’ freedom to carry firearms in a concealed manner, we hold that this activity does not fall within the scope of the Second Amendment’s protections.
We reach the same conclusion with respect to Peterson’s claim under the Privileges and Immunities Clause, U.S. Const, art. IV, § 2, cl. 1, which is coterminous with his right to travel claim. As the Supreme Court explained in Supreme Court of Virginia v. Friedman, 487 U.S. 59, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988), “it is only with respect to those ‘privileges’ and ‘immunities’ bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment.” Id. at 64-65, 108 S.Ct. 2260 (quotations and citations omitted). Because the concealed carrying of firearms has been prohibited for much of our histo *1202 ry, we conclude that this activity fails the Friedman test.
Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.
I
In February 2010, Peterson filed suit in federal district court against the ex officio sheriff of the City and County of Denver and the executive director of the Colorado Department of Public Safety, alleging that Colorado’s licensing regime for concealed handguns violates the Privileges and Immunities Clause, the Second Amendment, and the Fourteenth Amendment.[1] According to his complaint, Peterson is a resident of the State of Washington. At the time he filed his complaint, Peterson held a CHL issued by the State of Washington and a second CHL issued by the State of Florida.[2] Peterson is a frequent visitor to Denver, and seeks to carry a firearm when he visits the city. Towards that end, Peterson applied for a CHL with the Denver sheriff, a post now held by Martinez. Peterson’s application was denied because he does not meet the criteria set forth in Colo.Rev.Stat. § 18-12-203. Peterson alleges that the only statutory criterion he does not satisfy is Colorado residency.
Colorado provides for reciprocity and recognition of CHLs issued by other states, but only for states that provide reciprocity to Colorado CHLs. See Colo. Rev.Stat. § 18-12-213(1). Washington State does not provide reciprocity to Colorado CHLs, and thus Peterson’s Washington-issued CHL is not recognized by Colorado. Nor does Colorado recognize Peterson’s Florida or Utah CHLs because reciprocity is offered only with respect to CHLs issued by an individual’s state of residence. See Colo.Rev.Stat. § 18-12-213(l)(b)(I). Peterson alleges that Davis is “primarily responsible for administering the recognition and reciprocity of CHLs issued by other states.”
As a result of this statutory scheme, Peterson claims he is barred from carrying a concealed firearm outside of his home, place of business, or private automobile in Colorado. See Colo.Rev.Stat. § 18 — 12— 105. Peterson further notes that the Denver Revised Municipal Code prohibits individuals from carrying firearms — concealed or not — unless the individual holds a valid CHL or “is carrying the weapon concealed within a private automobile or other private means of conveyance, for hunting or for lawful protection of such person’s or another person’s person or property, while travelling.” Denver Rev. Mun.Code § 38-117(a), (b), & (f). Because Peterson does not own or otherwise control property in Denver, and generally uses public transit while visiting, he claims that he is “completely disarmed” when in Denver.
In his complaint, Peterson asserted six claims: (1) Martinez violated the Privileges and Immunities Clause by denying Peterson a CHL on the basis of non-residency; (2) Davis violated the Privileges and Immunities Clause by refusing reciprocity to Peterson’s Florida CHL while granting reciprocity to Florida CHLs held by Florida residents; (3) Martinez violated the Equal Protection Clause by denying Peterson a CHL on the basis of non-residency; (4) Davis violated the Equal Protection Clause by refusing reciprocity to Peterson’s Florida CHL; (5) Both defen *1203 dants violated the Second Amendment by “prohibiting any meaningful opportunity for [Peterson] to bear arms in the City and County of Denver through a licensing scheme that precludes [Peterson] from obtaining a necessary license”; and (6) Both defendants violated the Due Process Clause and the Privileges and Immunities Clause by prohibiting Peterson from bearing arms through the licensing scheme. Peterson requested a declaration that Colo.Rev.Stat. §§ 18-12-203(l)(a) and 213(l)(b)(I) are unconstitutional, and an injunction barring enforcement of those statutes.
Colorado Attorney General John Suth-ers filed a motion to dismiss on behalf of Davis, along with a “request to be heard.” Suthers argued that Davis had no role in enforcing Colorado’s CHL reciprocity system, and thus was shielded from suit by the Eleventh Amendment. He also cited a Colorado statute and a District of Colorado local rule requiring notice to the state attorney general of any suit challenging the constitutionality of a state statute. See Colo.Rev.Stat. § 13-51-115; D. Colo. L. Civ. R. 24.1. On that basis, Suthers requested an opportunity to be heard as to the constitutionality of the two challenged statutes.
Peterson argued in response that the court was required to accept as true his allegation that Davis is “primarily responsible for administering the recognition and reciprocity of CHLs issued by other states.” With respect to Suthers’ request to be heard, Peterson indicated he had no objection to Suthers’ intervention, but did object to Suthers’ participation as an ami-cus curiae. Peterson also filed a motion for summary judgment against Martinez, and Martinez cross-moved for summary judgment.
The district court granted the motion to dismiss Davis. It concluded that Colorado law requires sheriffs to administer the reciprocity scheme, and it need not credit allegations that are contradicted by statute. Because Davis was not involved in the administration of CHL reciprocity, the court dismissed the claims against Davis “without prejudice to substituting or naming an alternative defendant to represent the State of Colorado.” With respect to Suthers’ request to be heard, the court held that 28 U.S.C. § 2403(b) and Fed. R.Civ.P. 5.1(c) provide Suthers a right to intervene on behalf of the State of Colorado. The court thus allowed Suthers to intervene and delayed ruling on Peterson’s motion for summary judgment to allow Suthers an opportunity to respond.
In response to Peterson’s motion for summary judgment, Suthers presented evidence that permitting authorities have access to far more information regarding Colorado residents than residents of other states. Suthers submitted an affidavit from Michael Ostrander, a Detective with the Adams County Sheriffs Office who conducts CHL investigations. Ostrander stated that access to “locally-maintained databases is absolutely critical to assessing a [CHL] applicant’s qualifications.” He noted, for example, that misdemeanor convictions involving drugs, alcohol, or violence would disqualify an individual for a CHL in Colorado. However, such crimes are often prosecuted in municipal court and “municipal court convictions are virtually never reported to statewide or national databases.” Ostrander also described a number of relevant issues that a search of local databases would reveal about Colorado residents, including: mental health contacts or 911 calls that do not result in arrest; a history of aggressive driving tendencies; juvenile arrest records; and plea agreements that result in deferred sentences or diversion programs. Ostrander explained that he is able to screen for these issues for Colorado residents but that his “lack of access to this type of *1204 information held by other states would make it more or less impossible to effectively conduct this type of screening for non-resident [CHL] applicants.” Given the ninety-day statutory deadline for completing CHL investigations, see Colo.Rev. Stat. § 18-12-206(1), and the fees charged by some states for accessing background information, Ostrander opined: “If I were required to process [CHL] applications from non-residents, I do not believe that I could consistently ensure their eligibility to carry a concealed weapon under Colorado law.”
Suthers also submitted an affidavit from James Spoden, the Colorado Bureau of Investigation’s InstaCheck Data Supervisor. Spoden largely corroborated Ostran-der’s affidavit. He indicated that although national databases provided some background information on non-residents, “many records kept solely at the state level — and available only to state or local authorities — are highly relevant to a [CHL] applicant’s eligibility.” Spoden noted that in Colorado, information associated with an arrest, summons, or criminal charge would appear in a database accessible only to Colorado authorities. Similarly, protection or restraining orders in civil cases, reports that an individual has been determined to be a danger to himself, and juvenile felony adjudications are reported only in the same database. Spoden averred that other states have similar limitations and thus even if an applicant had a disqualification of this type, “state law enforcement authorities would have no way of acquiring information about” a non-resident CHL applicant. Further, Spoden noted that Colorado CHL holders are flagged on a state database if they are arrested in Colorado. This flagging system allows law enforcement to “ensure the ongoing eligibility of’ CHL holders, but does not provide “the ability to monitor [non-residents’] law enforcement contacts in their actual state of residence.” Spoden concluded that “it is virtually impossible to evaluate a non-resident [CHL] applicant’s background thoroughly enough to determine that the applicant, if granted a [CHL], will not be a danger to himself or the community.”
Suthers filed a separate cross-motion for summary judgment on largely the same grounds discussed above. In that motion, Suthers characterized Peterson as challenging both the Colorado permitting scheme and the Denver ordinance barring the open carrying of firearms without a CHL. In his response, Peterson flatly rejected this characterization, arguing that “Suthers is trying, in effect, to engage in a back door attack of Denver’s ban on open carry of firearms.” Peterson stated that although Suthers “is free to commence his own action against Denver if he chooses to do so, this case is not the proper vehicle for his attack.” Instead, Peterson explained that the Denver ordinance “is not per se unconstitutional,” but “[i]t is Defendant’s (and Colorado’s) refusal to allow Plaintiff to obtain a CHL that is unconstitutional.”
In ruling on the cross-motions for summary judgment, the district court accepted Peterson’s framing of his claims, stating that Peterson “alleges that Colorado’s state statutes regarding permits to carry concealed handguns, [Colo.Rev.Stat: § ] 18-12-201 et seq., are unconstitutional as applied to him.” Noting that Peterson elected not to name an alternative defendant with respect to the claims challenging Colorado’s reciprocity system, the court held that those claims had been abandoned. With respect to the remaining claims, the court concluded that Martinez was entitled to summary judgment. It determined that Peterson’s privileges and immunities/right to travel claim failed because the need for background information and monitoring was a substantial reason for treating residents and non-residents *1205 differently, and that the residency requirement was substantially related to that end. The court concluded that Peterson’s equal protection claim failed because residents and non-residents are not similarly situated given the differing quanta of information available for the two classes. As to the Second Amendment claim, the court applied intermediate scrutiny and concluded that the residency requirement was adequately justified by Colorado’s need to evaluate and monitor CHL holders and the difficulty in doing so for non-residents.
Following entry of judgment, Peterson timely appealed.
II
We first consider Peterson’s appeal of the district court’s order dismissing his claims against Davis. Our review of a dismissal based on sovereign immunity is de novo. See Governor of Kan. v. Kempthorne, 516 F.3d 833, 841 (10th Cir.2008). “The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state.” Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth., 577 F.3d 1255, 1258 (10th Cir.2009). And because “an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity,” the Eleventh Amendment provides immunity “when [s]tate officials are sued for damages in their official capacity.” Kentucky v. Graham, 473 U.S. 159, 166, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).
It is undisputed that Peterson’s claims against Davis are, in effect, claims against an arm of the State of Colorado. However, Peterson argues that the claims fall within the Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), exception to Eleventh Amendment immunity. That exception permits “suits against state officials seeking to enjoin alleged ongoing violations of federal law.” Crowe & Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1154 (10th Cir.2011). However, “[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.” Ex parte Young, 209 U.S. at 157, 28 S.Ct. 441. We have explained that “Defendants are not required to have a ‘special connection’ to the unconstitutional act or conduct. Rather, state officials must have a particular duty to ‘enforce’ the statute in question and a demonstrated willingness to exercise that duty.” Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 828 (10th Cir.2007).
Peterson does not cite to any provision of Colorado law establishing a connection between the executive director of the Department of Public Safety and enforcement of Colorado’s CHL reciprocity regime. Rather, he contends that the district court was required to accept as true the complaint’s allegation that Davis is “primarily responsible for administering the recognition and reciprocity of CHLs issued by other states.” A motion to dismiss based on sovereign immunity may come in one of two forms. “First, a party may make a facial challenge to the plaintiffs allegations concerning subject matter jurisdiction, thereby questioning the sufficiency of the complaint. In addressing a facial attack, the district court must accept the allegations in the complaint as true. Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends.” E.F.W. v. St. Stephen’s Indian High Sch., 264 F.3d 1297, 1303 (10th Cir.2001) (quotation and citations omitted). We consider the first type of *1206 challenge in this case, and thus accept the complaint’s well-pled factual allegations as true.
However, “we are not bound to accept as true a legal conclusion couched as a factual allegation.” Papasan v. Attain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citation omitted). Peterson’s allegation that Davis is “responsible for administering” CHL reciprocity is a bare legal assertion. The complaint merely states, without any supporting factual allegations, that Davis has a legal duty to enforce Colo.Rev.Stat. § 18-12-213. Nowhere does the complaint point to a legislative or administrative enactment so empowering Davis. Nor does the complaint allege any instances of Davis enforcing or administering the CHL reciprocity system, or being otherwise involved in Peterson’s attempt to obtain recognition of his out-of-state CHLs.
Further, the district court was correct to reject Peterson’s claim regarding Davis’ responsibility to administer the reciprocity system because even “factual allegations that contradict ... a properly considered document are not well-pleaded facts that the court must accept as true.” GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir. 1997). The district court properly took judicial notice of the Colorado Revised Statutes, see United States v. Coffman, 638 F.2d 192, 194 (10th Cir.1980), in which the Colorado General Assembly “instructs each sheriff to implement and administer the provisions of this part 2,” Colo.Rev. Stat. § 18-12-201(3). The referenced “part 2” runs from Colo.Rev.Stat. §§ 18-12-201 to 18-12-216, including the CHL reciprocity provisions found in Colo.Rev. Stat. § 18-12-213. Colorado law is clear that sheriffs are responsible for administering the reciprocity system. Accordingly, the district court was not required to accept Peterson’s allegation to the contrary.
Although Peterson does not cite to any provision of Colorado law imposing a duty to enforce Colo.Rev.Stat. § 18-12-213, he does note that Davis stated in his motion to dismiss that he “maintain[s] a database of states with which Colorado maintains reciprocity.” Based on this statement, Peterson argues that Davis fits within the Ex parte Young exception because he has “some connection” with enforcement of the reciprocity provision. 209 U.S. at 157, 28 S.Ct. 441. We disagree. Davis’ maintenance of a database may provide a convenient source for sheriffs seeking information relevant to CHL reciprocity, but Ex parte Young requires a nexus between the defendant and “enforcement ” of the challenged statute. Id. (emphasis added). As we held in Wagnon, the defendant must have “a particular duty to ‘enforce’ the statute in question and a demonstrated willingness to exercise that duty.” 476 F.3d at 828 (citation omitted). Davis has no such particular duty; rather, sheriffs are tasked with enforcing the CHL reciprocity system. See Colo.Rev.Stat. § 18-12-201(3).
Our decision in Chamber of Commerce of the United States v. Edmondson, 594 F.3d 742 (10th Cir.2010), is illustrative. There, we concluded that the Oklahoma Attorney General could be sued under the Ex parte Young exception with respect to a provision of Oklahoma law requiring public contractors to verify work eligibility for all new employees. Id. at 753, 760. Our holding was based on the existence of a state statute that directed the Attorney General to draft contracts on behalf of the state, and to prosecute and defend civil actions on behalf of the state. Id. at 760 (citing Okla. Stat. tit. 74, § 18b(A)(3), (7)). We further noted that the Attorney General had “a demonstrated willingness to ex *1207 ercise that duty.” Id. However, we reached the opposite conclusion with respect to a different portion of the same statute which made it a “discriminatory practice” to fire a citizen or permanent resident while employing an individual who was not authorized to work. Id. at 754, 760. With respect to that provision, we rejected the argument that the Attorney General’s non-specific duty to represent the state made him a proper defendant. Id. at 760. And because the plaintiff failed to “cite to any Oklahoma law authorizing the Attorney General to enforce that provision,” we held that plaintiff’s “claim under that provision falls outside the scope of the Ex parte Young exception.” Id.
A defendant need not be identified in the challenged statute itself to fit within the Ex parte Young exception. See Finstuen v. Crutcher, 496 F.3d 1139, 1151 (10th Cir.2007). Connection to the enforcement of an act may come by way of another state law, an administrative delegation, or a demonstrated practice of enforcing a provision. But when a state law explicitly empowers one set of officials to enforce its terms, a plaintiff cannot sue a different official absent some evidence that the defendant is connected to the enforcement of the challenged law. Colorado law requires sheriffs to enforce CHL reciprocity, not the executive director of the Department of Public Safety. See Colo.Rev. Stat. § 18-12-201(3). We thus affirm the district court’s conclusion that Davis is entitled to Eleventh Amendment immunity.
Ill
After correctly concluding that the claims against Davis did not fall within the Ex parte Young exception, the district court allowed Peterson an opportunity to amend his complaint to assert those claims against Martinez or another official. Peterson declined to do so. Peterson also declined to address the dismissal of the equal protection claim he asserted against Martinez. Accordingly, we proceed to consider whether summary judgment in favor of Martinez was appropriate with respect to Peterson’s Second Amendment claim and his right to travel/Privileges and Immunities Clause claim (which he contends presents two separate claims).
We review the district court’s grant of summary judgment de novo. See Simmons v. Sykes Enters., Inc., 647 F.3d 943, 947 (10th Cir.2011). Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. See Gwinn v. Awmiller, 354 F.3d 1211, 1215 (10th Cir.2004).
A
1
In District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held “that the Second Amendment conferred an individual right to keep and bear arms.” Id. at 595, 128 S.Ct. 2783. And in McDonald v. City of Chicago, — U.S.-, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the Court concluded that “the Second Amendment right is fully applicable to the States.” Id. at 3026. Nevertheless, the Court has provided precious little guidance with respect to the standard by which restrictions on the possession of firearms should be assessed.
In Heller, the Court determined that the challenged statute, which completely barred possession of handguns in the home and required that any lawful firearm be kept in an inoperable condition, failed “[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights.” 554 U.S. at 628, 128 S.Ct. *1208 2783. The Court rejected application of rational-basis scrutiny, but declined to select another standard. Id. at 628-29 & n. 27, 128 S.Ct. 2783. However, the Court stressed that its opinion should not be read to “cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms,” which the Court identified as “presumptively lawful regulatory measures.” Id. at 626-27 & n. 26, 128 S.Ct. 2783.
In United States v. Reese, 627 F.3d 792 (10th Cir.2010), this court adopted a “two-pronged approach” to Second Amendment claims. First, we “ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee.” Id. at 800. If the law does not impose a burden, it is constitutional. If it does, then the court “must evaluate the law under some form of means-end scrutiny.” Id. at 801.
We proceed to analyze Peterson’s Second Amendment claim under this two-step approach. Our task is complicated, however, by the somewhat unusual posture of Peterson’s claim. Peterson argues that strict scrutiny is appropriate because he is “completely disarmed” while in Denver. That alleged complete disarmament results from the confluence of two enactments: the state statute that requires CHL applicants to be legal residents of Colorado, Colo.Rev.Stat. § 18-12-203, and the Denver ordinance that requires a CHL for most forms of open carry, Denver Rev. MumCode § 38-117(a), (b), & (f).
Peterson has repeatedly expressed, however, that he is not challenging the Denver ordinance. After Suthers advocated for the constitutionality of the Denver ordinance in his motion for summary judgment, Peterson clarified that he was not arguing that the ordinance is unconstitutional, but that it is Colorado’s “refusal to allow Plaintiff to obtain a CHL that is unconstitutional.” Claiming that Suthers was attempting a “back door attack of Denver’s ban on open carry of firearms,” Peterson stated that “this case is not the proper vehicle for his attack.”
In light of Peterson’s explicit statement that “this case is not the proper vehicle” for an attack on the validity of the Denver ordinance, Peterson has clearly waived any such challenge. See United States v. Zubia-Torres, 550 F.3d 1202, 1206 (10th Cir. 2008) (an issue is waived, rather than forfeited, when a party “deliberately considered the unraised issue and made an intentional decision to forego it”). Because the district court accepted Peterson’s formulation of the case in ruling on the parties’ cross-motions for summary judgment, Peterson cannot be heard to complain of any alleged error he himself invited. See United States v. DeBerry, 430 F.3d 1294, 1302 (10th Cir.2005) (“[T]he invited-error doctrine precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt.”). We see no reason that a plaintiff could not challenge both the statute and the ordinance in the same suit, but Peterson has made a conscious decision not to challenge the constitutionality of the Denver ordinance.
Accordingly, we must conduct our two-step Second Amendment analysis based on the effects of the state statute rather than the combined effects of the statute and the ordinance. As we held in Reese, “a reviewing court first asks whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee.” 627 F.3d at 800 (quotation and alteration omitted, emphasis added). This case demonstrates the need for such an analytical framework. *1209 Peterson seeks a ruling that Colorado may not restrict CHLs to residents of the state. If he succeeds in this challenge, he would be free to obtain a CHL and carry a concealed weapon throughout the state. By contrast, had Peterson challenged the Denver ordinance, he may have obtained a ruling that allows him to carry a firearm openly while maintaining the state’s restrictions on concealed carry. The specific constitutional challenge thus delineates the proper form of relief and clarifies the particular Second Amendment restriction that is before us. Because only the Colorado statute has been challenged, and thus only the statute is at issue in the case at bar, we must look to the effect of that statute in conducting our Second Amendment assessment.
2
Colorado requires that “a sheriff shall issue a permit to carry a concealed handgun to an applicant who,” inter alia, “[i]s a legal resident of the state of Colorado.” Colo.Rev.Stat. § 18-12-203(l)(a). This residency requirement bars non-Colo-radoans from carrying concealed firearms in most places. But see Colo.Rev.Stat. § 18 — 12—105(2)(a) & (b) (exempting from the CHL licensure requirement possession in an individuars “own dwelling or place of business or on property owned or under his or her control” or “in a private automobile or other private means of conveyance”). It does not affect the ability of non-residents to openly carry firearms in the state (however, as discussed above, an unchallenged ordinance, Denver Rev. Mun. Code § 38 — 117(a), (b), & (f), imposes such restrictions in Denver).[3]
Accordingly, to determine “whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee,” Reese, 627 F.3d at 800, we first ask whether the Second Amendment provides the right to carry a concealed firearm. We conclude that it does not.[4]
In Robertson v. Baldwin, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897), the Supreme Court considered a Thirteenth Amendment challenge to a pair of statutes authorizing the detention of deserting seamen. Id. at 277, 280, 17 S.Ct. 326. In rejecting the challenge, the Court noted that many of the freedoms guaranteed by the Bill of Rights are subject to “certain well-recognized exceptions.” Id. at 281, 17 S.Ct. 326.
Thus, the freedom of speech and of the press does not permit the publication of libels, blasphemous or indecent articles, *1210 or other publications injurious to public morals or private reputation; the right of the people to keep and bear arms is not infringed by laws prohibiting the carrying of concealed weapons; the provision that no person shall be twice put in jeopardy does not prevent a second trial, if upon the first trial the jury failed to agree, or if the verdict was set aside upon the defendant’s motion; nor does the provision of the same article that no one shall be a witness against himself impair his obligation to testify, if a prosecution against him be barred by the lapse of time, a pardon, or by statutory enactment. Nor does the provision that an accused person shall be confronted with the witnesses against him prevent the admission of dying declarations, or the depositions of witnesses who have died since the former trial.
Id. at 281-82, 17 S.Ct. 326 (citations omitted, emphasis added).
The foregoing passage is plainly obiter dicta. See Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1184 (10th Cir.1995) (“Dicta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand.” (quotation omitted)). Nevertheless, we have observed that “we are bound by Supreme Court dicta almost as firmly as by the Court’s outright holdings, particularly when the dicta is recent and not enfeebled by later statements.” United States v. Serawop, 505 F.3d 1112, 1122 (10th Cir. 2007) (quotation omitted).
Although the Robertson Court’s statement does not qualify as recent, the Supreme Court’s contemporary Second Amendment jurisprudence does nothing to enfeeble — but rather strengthens — the statement that concealed carry restrictions do not infringe the Second Amendment right to keep and bear arms. As did Robertson, the Heller opinion notes that, “[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” 554 U.S. at 626, 128 S.Ct. 2783. As an example of the limited nature of the Second Amendment right to keep and carry arms, the Court observed that “the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.” Id. And the Court stressed that “nothing in our opinion should be taken to cast doubt on longstanding prohibitions.” Id.
There can be little doubt that bans on the concealed carrying of firearms are longstanding. In Heller, the Supreme Court cited several early cases in support of the statement that most nineteenth century courts approved of such prohibitions. See Nunn v. State, 1 Ga. 243, 251 (1846) (“[S]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.” (emphasis omitted)); State v. Chandler, 5 La. Ann. 489, 490 (1850) (“This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.”); see also Robertson, 165 U.S. at 281-82, 17 S.Ct. 326 (“[T]he right of the people to keep and bear arms ... is not infringed by laws prohibiting the carrying of concealed weapons.”). Dissenting in McDonald, Justice Breyer farther discussed the history of concealed carry regulations. See 130 *1211 S.Ct. at 3132 (Breyer, J., dissenting) (citing to an 1847 Virginia statute that barred the carrying of pistols “hidden from common observation”); id. at 3134 (noting that “[flifteen States banned the concealed carry of pistols and other deadly weapons” during the post-Civil War era). We note, however, that this view was not unanimous. See Bliss v. Commonwealth, 12 Ky. 90, 91-92 (1822) (striking a ban on concealed carry as inconsistent with a state constitutional provision). Nevertheless, “[m]ost states qnacted laws banning the carrying of concealed weapons” in the nineteenth century. Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 95 (2d Cir.2012); see also id. at 95 n. 21 (collecting statutes).
Scholars have also noted the long history of concealed carry restrictions in this country. See David T. Hardy, The Rise & Demise of the “Collective Right” Interpretation of the Second Amendment, 59 Clev. St. L.Rev. 315, 333 (2011) (“Beginning in the 1820s, State courts faced issues arising from the interaction of early weapons laws, chiefly bans on concealed carry. Most rulings upheld the bans.... ” (footnote omitted)); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 U.C.L.A. L.Rev. 1443, 1516 (2009) (“This tradition [of prohibiting the concealed carry of firearms] does indeed go back to 1813 and the following decades, at least in some Southern and border states, as well as in Indiana, and by the end of the 19th century the constitutionality of such bans had become pretty broadly accepted.” (footnote omitted)); Adam Winkler, Heller’s Catch-22, 56 U.C.L.A. L.Rev. 1551,1569 (2009) (“The Court was correct to recognize the long historical pedigree of bans on concealed carry, which date back much further than the other exceptions recognized by the Court.”). Given this lengthy history of regulation, restrictions on concealed carry qualify as “longstanding” and thus “presumptively lawful regulatory measures.” Heller, 554 U.S. at 626 & n. 26, 128 S.Ct. 2783; see also National Rifle Association of America, Inc., v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 196 (5th Cir.2012) (“Heller demonstrates that a regulation can be deemed ‘longstanding’ even if it cannot boast a precise founding-era analogue.... Heller considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage.” (citations omitted)).
We agree with the Fifth Circuit that in applying the two-step approach to Second Amendment claims, we consider at the first step “whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee.” Nat’l Rifle Ass’n, 700 F.3d at 194 (citations omitted). As the foregoing demonstrates, concealed carry bans have a lengthy history. See Kachalsky, 701 F.3d at 95 & n. 21 (noting that most states banned concealed carry in the nineteenth century). Given the dicta in Robertson, 165 U.S. at 281-82, 17 S.Ct. 326, and the Supreme Court’s admonition in Heller that “nothing in our opinion should be taken to cast doubt on longstanding prohibitions,” 554 U.S. at 626, 128 S.Ct. 2783, we conclude that Peterson’s Second Amendment claim fails at step one of our two-step analysis: the Second Amendment does not confer a right to carry concealed weapons.
Peterson does not convincingly argue otherwise. In his reply brief, Peterson contends that he “does not assert a Second Amendment right to carry a concealed weapon,” but rather challenges the prohibition because it deprives him of “any meaningful opportunity” to bear arms in the City of Denver. (Emphasis omitted.) However, for the reasons set forth in Section III.A.1, supra, we reject that charac *1212 terization of Peterson’s Second Amendment claim. Peterson has affirmatively waived any challenge to the Denver ordinance’s restriction on the open carrying of firearms. And because we conclude that the concealed carrying of firearms falls outside the scope of the Second Amendment’s guarantee, Peterson’s Second Amendment claim was properly subject to summary judgment.[5]
B
In addition to his Second Amendment claim, Peterson argues that the residency requirement violates his right to travel and the Privileges and Immunities Clause, U.S. Const, art. IV, § 2, cl. 1. The district court treated these claims as one in the same. Peterson argues that this was error. He contends that his right to travel claim is grounded not just in the Privileges and Immunities Clause, but also in the Privileges or Immunities Clause of the Fourteenth Amendment and the Equal Protection Clause. Peterson argues that his separate right to travel claim is subject to strict scrutiny.
1
In support of his assertion that an independent right to travel claim is subject to strict scrutiny, Peterson relies heavily on Selevan v. New York Thruway Authority, 584 F.3d 82 (2d Cir.2009). In that case, plaintiffs challenged a regulation allowing residents of Grand Island, N.Y., to pay a lesser toll to cross the Grand Island Bridge than that charged to other drivers. Id. at 87. The court read the complaint as asserting a claim that the state violated plaintiffs’ “right to free movement” or “right of free interstate migration,” which is protected by the Privileges or Immunities Clause of the Fourteenth Amendment and the Equal Protection Clause. Id. at 99 (quotations omitted). Concluding that this right extended to the “right to intrastate as well as interstate travel,” id. at 100, the court remanded the claim to allow the district court to determine whether the challenged policy imposed only a “minor restriction on travel,” id. at 102. If the toll differential was found to be a non-minor restriction, the Second Circuit instructed the district court to apply strict scrutiny to the residency classification. Id.
We reject Peterson’s reliance on Sele-van. Although plaintiffs in that ease asserted a right to travel claim, the claim at issue there bears little resemblance to that asserted by Peterson. In Saenz v. Roe, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), the Supreme Court noted that the “right to travel” includes “at least three different components.” Id. at 500, 119 S.Ct. 1518.
It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

Id.

The claim at issue in Selevan plainly fell into the first category; it was based on *1213 “the right to go from one place to another.” Id. As the Court noted in Saenz, this right includes the “right to travel freely to and from [a state] and to use highway facilities and other instrumentalities of interstate commerce within the” state. Id. at 500-01, 119 S.Ct. 1518 (quoting United States v. Guest, 383 U.S. 745, 757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966)). This is precisely the type of activity restricted in Selevan. And under Second Circuit precedent, this right extends to purely intrastate travel. See Selevan, 584 F.3d at 100 (citing Williams v. Town of Greenburgh, 535 F.3d 71, 75 (2d Cir.2008)).
The right to travel claim asserted by Peterson is unrelated to his freedom to “go from one place to another.” Saenz, 526 U.S. at 500, 119 S.Ct. 1518. As he concedes in his briefing, the only right to travel claim at issue in this case concerns Peterson’s “right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in” another state. Id. Although the textual basis of the right to enter and leave a state was not identified, see id. at 501, 119 S.Ct. 1518, the Saenz Court made clear that the latter type of right to travel is “expressly protected by the text of the Constitution” by way of the “first sentence of Article IV, § 2,” which is the Privileges and Immunities Clause. 526 U.S. at 501, 119 S.Ct. 1518. Accordingly, Saenz specifies that a right to travel claim based on the “welcome visitor” doctrine is a Privileges and Immunities Clause claim. Id.; see also Bach v. Pataki, 408 F.3d 75, 87 (2d Cir. 2005) (pointing out that the right to travel “is simply a shorthand for the protections of the Privileges and Immunities Clause of Article TV” and relying on Saenz to hold that the “welcome visitor” component of the right to travel “is merely a restatement of rights arising under Article IV”), overruled on other grounds, McDonald, 130 S.Ct. at 3026; Doe v. Miller, 405 F.3d 700, 711 (8th Cir.2005) (citing Saenz for the proposition that the “welcome visitor” component of the right to travel arises from the Privileges and Immunities Clause of Article IV); Chavez v. Ill. State Police, 251 F.3d 612, 649 (7th Cir.2001) (stating that the “welcome visitor” prong of the right to travel is “expressly protected by Article IV, Section 2, Clause 1 of the Constitution”). We thus hold that Peterson’s right to travel claim is coterminous with his privileges and immunities argument.
2
The “Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” U.S. Const, art. IV, § 2, cl. 1. Although this clause “establishes a norm of comity” among the states, it does not “speeify[] the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment.” Austin v. New Hampshire, 420 U.S. 656, 660, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). In Supreme Court of Virginia v. Friedman, 487 U.S. 59, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988), the Supreme Court set forth a two-prong test to determine whether a statute violates the Privileges and Immunities Clause. First, a court asks whether the restricted activity is
sufficiently basic to the livelihood of the Nation ... as to fall within the purview of the Privileges and Immunities Clause. For it is only with respect to those “privileges” and “immunities” bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment.
Id. at 64-65, 108 S.Ct. 2260 (quotations and citations omitted). “Second, if the challenged restriction deprives nonresidents of a protected privilege, we will invalidate it only if we conclude that the restriction is not closely related to the *1214 advancement of a substantial state interest.” Id. at 65, 108 S.Ct. 2260 (citation omitted).
Many of the activities identified by the Court as privileges and immunities are economic in nature. The Court has repeatedly held that “the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause.” United Building & Constr. Trades Council v. Mayor and Council of Camden, 465 U.S. 208, 219, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984); see Saenz, 526 U.S. at 502, 119 S.Ct. 1518 (listing an out of state traveler who seeks to “obtain employment, to procure medical services, or even to engage in commercial shrimp fishing” as seeking to take part in protected privileges) (citations omitted); Hicklin v. Orbeck, 437 U.S. 518, 524, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (pointing out that the Privileges and Immunities Clause forbids “discrimination against nonresidents seeking to ply their trade, practice their occupation, or pursue a common calling”). Several other privileges and immunities cases have concerned differential tax treatment of non-residents. See Lunding v. N.Y. Tax Appeals Tribunal, 522 U.S. 287, 302, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) (“[T]he Privileges and Immunities Clause prohibits a State from denying nonresidents a general tax exemption provided to residents....”); Austin, 420 U.S. at 661, 95 S.Ct. 1191 (“[T]he fundamental privileges and immunities protected by the Clause” include “an exemption from higher taxes or impositions than are paid by the other citizens of the state.” (quotation omitted)); Shaffer v. Carter, 252 U.S. 37, 56, 40 S.Ct. 221, 64 L.Ed. 445 (1920) (“One of the rights intended to be secured by the [Privileges and Immunities Clause] is that a citizen of one State may remove to and carry on business in another without being subjected in property or person to taxes more onerous than the citizens of the latter State are subjected to.”).
However, in the infamous Dred Scott case, the Court worried that recognizing African Americans as citizens would entitle them to all the privileges and immunities of citizenship, including “the full liberty ... to keep and carry arms wherever they went.” Scott v. Sandford, 60 U.S. 393, 417, 19 How. 393, 15 L.Ed. 691 (1856).[6] And the Court “has never held that the Privileges and Immunities Clause protects only economic interests.” Supreme Court of N.H. v. Piper, 470 U.S. 274, 281 n. 11, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985); see also Doe v. Bolton, 410 U.S. 179, 200, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (striking residency requirement in abortion statute on privileges and immunities grounds). A separate line of privileges and immunities cases prohibits the states from denying non-residents access to the court system. See Miles v. Illinois C.R. Co., 315 U.S. 698, 704, 62 S.Ct. 827, 86 L.Ed. 1129 (1942) (“To deny citizens from other states ... access to its courts would, if it permitted access to its own citizens, violate the Privileges and Immunities Clause.”); McKnett v. St. Louis & San Francisco R. Co., 292 U.S. 230, 233, 54 S.Ct. 690, 78 L.Ed. 1227 (1934) (“The privileges and immunities clause requires a state to accord to citizens of other states substantially the same right of access to its courts as it accords to its own citizens.”).
*1215 Thus, although many of the activities protected by the Privileges and Immunities Clause concern economic activities, the relevant inquiry at step one of the Friedman test is simply whether the regulated activity is “sufficiently basic to the livelihood of the Nation.” 487 U.S. at 64, 108 S.Ct. 2260 (quotation omitted). The “primary purpose” of the clause “was to help fuse into one Nation a collection of independent, sovereign States.” Toomer v. Witsell, 834 U.S. 385, 395, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). Accordingly, only those distinctions that “hinder the formation, the purpose, or the development of a single Union of those States” are barred. Baldwin v. Fish & Game Comm’n, 436 U.S. 371, 383, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978).
We applied this test in a non-economic context in Nelson v. Geringer, 295 F.3d 1082, 1090 (10th Cir.2002), concluding that service in the National Guard is protected by the Clause. Such service, we noted, “provides the only opportunity United States citizens have to volunteer to participate in defending their country without having to commit their career and lifestyle exclusively to” the military. Id. Given the importance of the National Guard “to overall national military power,” we held that service is “basic to the livelihood of the Nation.” Id. (quotation omitted). Further, because we could “imagine few activities comparable to participating in national military service that tend to constitute United States citizens as ‘one people’ and to promote a sense and a mission of national unity,” we determined that National Guard service “bears on the vitality of the Nation as a single entity.” Id. (citation omitted).
As the plain language of the Friedman test suggests, however, many activities fall outside the scope of the Clause’s protection. “Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted.” Baldwin, 436 U.S. at 383, 98 S.Ct. 1852. In Baldwin, for example, the Court easily concluded that the state of Montana could distinguish between residents and nonresidents in pricing elk-hunting licenses: “Does the distinction made by Montana between residents and nonresidents in establishing access to elk hunting threaten a basic right in a way that offends the Privileges and Immunities Clause? Merely to ask the question seems to provide the answer.” Id. at 388, 98 S.Ct. 1852. Because elk hunting “is a recreation and a sport” rather than “a means to the nonresident’s livelihood,” the Court held, the activity “is not basic to the maintenance or well-being of the Union.” Id.
Peterson’s claim does not implicate any of the privileges recognized previously by the Supreme Court. The concealed carrying of a firearm does not impact his ability to pursue a common calling or other employment,[7] Saenz, 526 U.S. at 502, 119 S.Ct. 1518, result in unfavorable tax consequences, Austin, 420 U.S. at 661, 95 S.Ct. 1191, or limit his access to the courts, McKnett, 292 U.S. at 233, 54 S.Ct. 690. Nor does Peterson contend that he seeks to carry a concealed firearm as part of National Guard or other military service. See Nelson, 295 F.3d at 1090.
For largely the same reasons that we reject Peterson’s Second Amendment claim, we conclude that carrying a concealed weapon is not a privilege or immunity protected under Article IV. As discussed in Section III.A.2, supra, our nation has a lengthy history of restricting the *1216 concealed carry of firearms. See Heller, 554 U.S. at 626, 128 S.Ct. 2783 (“[T]he majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.”); Kachalsky, 701 F.3d at 95 & n. 21 (noting that “[m]ost states enacted laws banning the carrying of concealed weapons” in the nineteenth century and collecting statutes). And in Robertson, the Court included in a list of “well-recognized exceptions” to enumerated rights “laws prohibiting the carrying of concealed weapons.” 165 U.S. at 281-82, 17 S.Ct. 326.
Given that the concealed carrying of firearms has not been recognized as a right, and the fact that concealed carry was prohibited for resident and non-resident alike for much of our history, we cannot declare this activity “sufficiently basic to the livelihood of the Nation.” Friedman, 487 U.S. at 64, 108 S.Ct. 2260 (quotation omitted). Further, Peterson has not explained the manner in which prohibitions on the carrying of a concealed weapon might “hinder the formation, the purpose, or the development of a single Union.” Baldwin, 436 U.S. at 383, 98 S.Ct. 1852. Instead, like the elk hunting at issue in Baldwin, the carrying of a concealed firearm “is not basic to the maintenance or well-being of the Union.” Id. at 388, 98 S.Ct. 1852. Accordingly, Peterson’s privileges and immunities claim fails at step one of the Friedman analysis.[8]
IV
For the foregoing reasons, the judgment of the district court is AFFIRMED.

. At the time the complaint was filed, these offices were held by Alvin LaCabe and Peter Weir, respectively. Alex Martinez and James Davis have been substituted pursuant to Fed. R.Civ.P. 25 and Fed. R.App. P. 43(c). For ease of reference, we will use the names of the current appellees even if a different individual held the post at the relevant time.

. Peterson states in his opening brief that he no longer holds a Florida CHL, but has since been issued a CHL by the State of Utah.

. We reject Suthers' argument on appeal that Peterson lacks standing because he challenged the statute rather than the ordinance. Suthers contends that because the Second Amendment does not protect concealed carrying of firearms, Peterson's only injury stems from the unchallenged Denver ordinance. This argument confuses the standing and merits inquiry. "For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff’s asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing.” Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1092 (10th Cir.2006). Because “we must assume the Plaintiffs’ claim has legal validity,” id. at 1093, we conclude that Peterson has standing. He has alleged an injury in fact— prohibition on carrying a concealed weapon — that is traceable to Martinez's actions and would be redressed by a decision in his favor. Cf. Hydro Res., Inc. v. EPA, 608 F.3d 1131, 1144 (10th Cir.2010) (en banc) (setting forth the three elements of standing).

. Although the district court did not rely upon this ground in granting summary judgment to Martinez, “we are free to affirm a grant of summary judgment on grounds different than those used by the district court if the record is sufficient to support such grounds.” Stat-Tech Int'l Corp. v. Delutes (In re Stat-Tech Int’l Corp.), 47 F.3d 1054, 1057 (10th Cir. 1995).

. As the Court noted in Heller, the Constitution prohibits irrational laws separate and apart from the restrictions imposed by the Second Amendment. See 554 U.S. at 628 n. 27, 128 S.Ct. 2783 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Accordingly, a statute regulating concealed carry may be unconstitutional if it fails the rational basis test regardless of the scope of the Second Amendment. We do not construe Peterson's filings as asserting such a challenge, however.

. In McDonald, the Court discussed whether the right to bear arms was protected by the Privileges or Immunities Clause of the Fourteenth Amendment, but declined to consider the issue because "the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause.” 130 S.Ct. at 3030-31. The Court did not address the Privileges and Immunities Clause of Article IV.

. Peterson does not argue that he seeks to carry a concealed weapon as part of his employment or that his inability to carry a concealed weapon affects his ability to pursue employment opportunities.

. Justice Thomas, concurring in McDonald, concluded that the Privileges or Immunities Clause of the Fourteenth Amendment "establishes a minimum baseline of federal rights, and the constitutional right to keep and bear arms plainly was among them.” 130 S.Ct. at 3083 (Thomas, J., concurring). Justice Thomas also expressed the view that "the privileges and immunities of state and federal citizenship,” protected by Article IV and the Fourteenth Amendment, respectively, "overlap.” Id. at 3085. Under this reading, the right to keep and bear arms may qualify as a privilege protected under Article IV. Given our conclusion in Section III.A.3 that the Second Amendment does not protect the concealed carrying of firearms, our holding that concealed carry is not a privilege of state citizenship does not conflict with this line of analysis. We do not suggest that the Privileges and Immunities Clause excludes Second Amendment rights; we address only concealed carry restrictions in the case at bar.