[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-15115

_____

D. C. Docket No. 08-00635-CV-FTM-29SPC

CITIZENS FOR POLICE ACCOUNTABILITY POLITICAL
COMMITTEE,
FLORIDA STATE CONFERENCE OF THE NATIONAL
ASSOCIATION  FOR THE ADVANCEMENT
OF COLORED PEOPLE,

Plaintiffs-Appellees,

versus

KURT S. BROWNING,
in his capacity as Secretary of State of
the State of Florida,
SHARON L. HARRINGTON,
in her official capacity as Supervisor of
Elections, Lee County,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 25, 2009)

Before DUBINA, Chief Judge, EDMONDSON and HILL, Circuit Judges.

PER CURIAM:

This appeal is about voting. Florida Statute § 102.031(4) says that no person may solicit voters "within 100 feet of the entrance to any polling place . . . or early voting site," and broadly defines "solicit" to include, among other things, "seeking or attempting to seek a signature on any petition[.]" Fla. Stat. §§ 102.031(4)(a)–(b).[1] The Florida statute codifies the Florida legislature's view that the right of Florida's citizens to vote warrants substantial protection from commotion -- that is, bustle, stir, confusion -- around the voting place. Today, we must decide whether the Florida legislature went too far in defending the right to vote by banning solicitation that targets voters exiting polling places[2] and that also concerns matters unrelated to any issue then on the ballot. We conclude that the Florida legislature did not go beyond its lawful power and, thus, reverse the district court's decision to bar enforcement of the Florida statute.

## Background

---

[1]The Florida statute defines "solicit" and "solicitation" to "include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item. The terms 'solicit' or 'solicitation' shall not be construed to prohibit exit polling." Fla. Stat. § 102.031(4)(b).

[2]When we refer to polling places in this opinion, we also mean early voting sites.

2

Plaintiff Citizens for Police Accountability Political Committee is a political action committee in the State of Florida. Plaintiff Florida State Conference of the NAACP is the parent organization of 60 Florida branches of the national NAACP. Plaintiffs support an amendment to the Fort Myers, Florida, city charter that would create a citizen oversight panel for the city police department. To place the charter amendment on a ballot, though, Plaintiffs must gather signatures from "10 percent of the [city's] registered electors as of the last preceding municipal general election." Fla. Stat. § 166.031(1). Plaintiffs claim that the best way to obtain signatures is to approach voters exiting polling places.

In January 2008, Plaintiff Citizens for Police Accountability Political Committee tried to solicit signatures from voters leaving a polling place in Fort Myers.[3] Although the proposed charter amendment related to nothing then on the ballot, election officials, in accordance with the Florida statute, banned the signature-gatherers from soliciting voters within 100 feet of the polling place. Plaintiffs say that many voters were able to park, vote, and leave without interacting with the signature-gatherers.

Then in August 2008, Plaintiffs filed suit and sought injunctive relief under

_____

[3]Plaintiff Florida State Conference of the NAACP did not join the petition-circulation effort until April 2008.

42 U.S.C. § 1983 against Kurt S. Browning, in his capacity as Secretary of State of the State of Florida, and Sharon L. Harrington, in her capacity as Supervisor of Elections in Lee County, Florida (collectively, the State). Plaintiffs claimed that the Florida statute violated their First Amendment right to engage in political speech at polling places. Plaintiffs asked the district court to declare the Florida statute unconstitutional on its face and as it applied to their exit-solicitation efforts. Plaintiffs also sought to enjoin the State from enforcing the Florida statute against them when they solicited voters leaving polling places on election day later in August. As with the January election, the proposed charter amendment related to nothing on the ballot in the August election.

The district court held oral argument just before the August election. The next day, the district court entered a preliminary injunction enjoining the State from enforcing the Florida statute against Plaintiffs at polling places on election day.[4] The district court concluded that the Florida statute was probably unconstitutional as it applied to Plaintiffs' exit-solicitation efforts because the State had produced little evidence that the exit-solicitation ban was necessary to serve a

---

[4]The district court refused to issue an injunction on the ground that the Florida statute is facially unconstitutional. The district court, instead, granted the injunction on an "as applied" basis: the State -- even extremely close to the polls -- could not enforce or threaten to enforce the Florida statute "as to Plaintiffs' peaceful, orderly and non-disruptive (1) solicitation of signatures (2) for their petition to place an amendment of the Fort Myers City Charter on a future ballot (3) from voters at polling places and early voting sites (4) after the voters have voted (5) during the August 26, 2008 election and its early voting period."

-4-

compelling interest or that it was sufficiently drawn to achieve that end. The State

appeals.[5]

## Standard of Review

We review a preliminary injunction for an abuse of discretion. Klay v.

United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004). A district court

abuses its discretion if it applies an incorrect legal standard, applies the law in an

unreasonable or incorrect manner, follows improper procedures in making a

determination, or makes findings of fact that are clearly erroneous. Id. We review

*de novo* questions of law. United States v. Endotec, Inc., 563 F.3d 1187, 1194

---

[5]In late 2008, the district court concluded that it had no case or controversy before it and, thus, dismissed the case after Plaintiffs alleged that they acquired the requisite number of signatures to place the proposed charter amendment on a ballot. No party has argued, however, that this appeal is moot or that we otherwise lack jurisdiction. We have considered the matter of our jurisdiction independently, and we conclude that this appeal remains worthy of our attention because the election-related issue involving the State and, at least, Plaintiff Florida State Conference of the NAACP -- the issue of the right to engage in peaceful exit solicitation about non-ballot issues near polling places -- is "capable of repetition, yet evading review." Sierra Club v. Martin, 110 F.3d 1551, 1554 (11th Cir. 1997) (preliminary injunction expired but appeal not moot where seasonal nature of bird nesting made it likely that forest service would face another injunction and where duration of injunction was too short to allow for appellate review before injunction expired); see also Fed. Election Comm'n v. Wis. Right To Life, Inc., 127 S. Ct. 2652, 2663 (2007) ("We have recognized that the 'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks. Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge-down to the last detail-would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges.") (internal quotation marks and citation omitted); Storer v. Brown, 94 S. Ct. 1274, 1282 n.8 (1974) (although pertinent election was "long over," appeal concerning election-related statute not moot because "construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held").

(11th Cir. 2009).

## Discussion

A preliminary injunction is an "extraordinary and drastic remedy." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998) (quoting All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989)). To secure an injunction, a party must prove four elements: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) the injury outweighs whatever damage an injunction may cause the opposing party; and (4) an injunction is not adverse to the public interest. Id.

The State challenges on appeal only the district court's conclusion that Plaintiffs established a substantial likelihood of success on the merits of their claim that the Florida statute is unconstitutional as it applies to exit-solicitation efforts. The State admits that the Florida statute infringes some on Plaintiffs' right to engage in political speech[6] (see Meyer v. Grant, 108 S. Ct. 1886, 1892 (1988)) but contends that the restriction is necessary and narrowly tailored to protect the, at least, equally critical right to vote free from intimidation, interference, and fraud.

In Burson v. Freeman, 112 S. Ct. 1846 (1992), the Supreme Court addressed

---

[6]Plaintiffs contend that the Florida statute also infringes some on their First Amendment right to engage in political association. But even if true, the additional infringement has no material affect on the analysis otherwise applicable here; so we discuss it no further.

the facial constitutionality of a Tennessee statute that proscribed campaign activity within 100 feet of a polling place.[7] Id. at 1848. Considering the Tennessee statute as a content-based restriction on political speech in a public forum, the statute could survive only if it was "necessary to serve a compelling state interest" and was "narrowly drawn to achieve that end." Id. at 1851 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 103 S. Ct. 948, 955 (1983)).

The Supreme Court upheld the Tennessee statute.[8] In doing so, a plurality of the Supreme Court[9] first reviewed whether Tennessee had a compelling interest to support its statute. Tennessee offered two: (1) protecting voters from confusion

---

[7]The Tennessee statute banned within 100 feet of a polling place "the display of campaign posters, signs or other campaign materials, distribution of campaign materials, and solicitation of votes for or against any person or political party or position on a question[.]" Burson, 112 S. Ct. at 1848. Like the Florida statute, which saves exit polling from its grasp, Fla. Stat. § 102.031(4)(b), the Tennessee statute also did not restrict exit polling. Burson, 112 S. Ct. at 1855. We express no view on the constitutionality of a statute that bans exit polling around polling places.

[8]Justice Blackmun authored the plurality opinion, which Chief Justice Rehnquist and Justices White and Kennedy joined. Justice Kennedy also filed a concurring opinion, and Justice Scalia filed an opinion concurring in the judgment. Justice Stevens filed a dissenting opinion, which Justices O'Connor and Souter joined. Justice Thomas did not participate in the decision.

[9]Justice Scalia joined in the judgment, but not in the plurality opinion. Justice Scalia reviewed the Tennessee statute under a less exacting standard than the strict scrutiny applied by the other Justices because he believed that the statute did not restrict speech in a "traditional public forum." Id. at 1859–61 (Scalia, J., concurring in judgment). His justification, therefore, seems to be broader than the plurality opinion. So, we look to the plurality opinion for guidance. Marks v. United States, 97 S. Ct. 990, 994 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks omitted).

and undue influence; and (2) preserving the integrity of the election process. Id. at 1851–52. The plurality agreed that those interests were sufficiently compelling to warrant protection. Id.

The plurality then turned to whether the Tennessee statute was necessary to serve those compelling interests. In typical cases involving strict-scrutiny review, the Supreme Court would look to the state to offer evidence that the pertinent statute is necessary to promote the compelling interest. See Eu v. San Francisco County Democratic Cent. Comm., 109 S. Ct. 1013, 1021–23 (1989). But in Burson, the plurality required Tennessee to produce no evidence of necessity. Burson, 112 S. Ct. at 1856. Instead, the plurality relied on the long history of regulation to combat election misconduct, the substantial consensus in favor of a secret ballot secured by a campaign-free zone that emerged from that history, and common sense to conclude "that *some* restricted zone around the voting area" was necessary to secure Tennessee's compelling interests. Id. (emphasis in original).

The plurality last examined whether the Tennessee statute was narrowly tailored. To pass this test, a state normally must show that the pertinent statute used the least restrictive means available to serve the compelling interest. See Boos v. Barry, 108 S. Ct. 1157, 1168 (1988). The plurality recognized, however, that it faced a unique situation because of the importance of protecting the right to

vote and the difficulties in and dangers of requiring Tennessee to demonstrate the effects of its statute on political stability.[10] Burson, 112 S. Ct. at 1856–57. So the plurality departed from the customary analysis and applied a modified "burden of proof" under which the Tennessee statute was sufficiently tailored if it was "reasonable" and did not "*significantly impinge* on constitutionally protected rights." Id. at 1857 (emphasis in original). The plurality concluded that the minor geographic limitation in the Tennessee statute -- 100 feet -- satisfied this more lenient standard. Id. The statute was constitutional.

The parties dispute the extent to which Burson affects this case. The State says that the Florida statute is no different than the Tennessee statute in Burson and, thus, the Florida statute should survive for the same reasons. Plaintiffs, on the other hand, claim that the facts in Burson are materially different because there a campaign worker wanted to solicit *votes* on election day, while here Plaintiffs aim

_____

[10]The plurality explained those difficulties and dangers this way:

> Elections vary from year to year, and place to place. It is therefore difficult to make specific findings about the effects of a voting regulation. Moreover, the remedy for a tainted election is an imperfect one. Rerunning an election would have a negative impact on voter turnout. Thus, requiring proof that a 100-foot boundary is perfectly tailored to deal with voter intimidation and election fraud would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action.

Burson, 112 S. Ct. at 1856–57 (internal quotation marks and footnote omitted).

only to seek the supporting signatures of voters -- who had already voted -- about a non-ballot issue.

We accept that Burson does not bind us here; the material facts are different in some ways. Nevertheless, we believe that the Burson plurality opinion is highly persuasive; and we extend its reasoning to the facts of this case.

1.    Compelling Interest

Under the Burson plurality's standard, we must first examine whether the State has a compelling interest to support its statute. The State contends that it shares the same compelling interests as Tennessee in Burson: (1) protecting voters from confusion and undue influence; and (2) preserving the integrity of the election process. Plaintiffs take no issue with the presence or legitimacy of those compelling interests in this case. Nor do we.

2.    Necessity

Having identified the pertinent compelling interests, we turn to the more difficult question of whether the Florida statute is necessary to serve those interests. The State claims that it need not produce evidence of exit solicitors intimidating voters or interfering with the election process to prove necessity. Instead, the State asserts that it, like Tennessee in Burson, may rely on our country's long history of election regulation, the widespread agreement that

emerged from that history, and common sense to show that the ban on exit solicitation within 100 feet of a polling place is necessary to promote its compelling interests.

Plaintiffs criticize this approach. They say that exit solicitation is a peaceful, non-disruptive activity targeting only those voters who have already voted[11] and claim that this "already-voted" feature distinguishes their conduct from the more intimidating, violent, and unsavory behavior talked about in the Burson plurality opinion.[12] Plaintiffs, therefore, argue that the State may not rely on the historical evidence of election abuse discussed in the Burson plurality opinion but must instead offer its own proof that the ban on exit solicitation in the Florida statute is necessary. Echoing the district court, Plaintiffs say that the State has produced no

---

[11]Plaintiffs compare exit solicitation to exit polling. Plaintiffs contend that the Florida statute cannot lawfully prohibit one and permit the other because, according to Plaintiffs, the activities are constitutionally indistinguishable. But we disagree: exit polling does not include advocating for the success of some political proposal or candidate. Like other courts before us, we see fundamental differences between the two activities and, therefore, reject the comparison. See, e.g., Schirmer v. Edwards, 2 F.3d 117, 122 (5th Cir. 1993) (exit polling cases not applicable to solicitation cases); Am. Broad. Co. v. Blackwell, 479 F. Supp. 2d 719, 738 (S.D. Ohio 2006) ("[E]xit polling cannot reasonably be construed as a form of electioneering under any definition of that term."). Moreover, the plurality in Burson expressly said that the Tennessee statute did not need to prohibit exit polling to survive strict-scrutiny review. Burson, 112 S. Ct. at 1855.

[12]Plaintiffs claim that the plurality in Burson found no history of electoral abuse by and no history of election-reform efforts directed at exit solicitors. They cite as support the following language in the plurality opinion: "[T]here is simply no evidence that political candidates have used other forms of solicitation or exit polling to commit such electoral abuses." Id. at 1856. But we believe that the plurality is referring in this dictum to "charitable and commercial solicitation" and not, as Plaintiffs suggest, to forms of political canvassing like exit solicitation. So we afford this argument little weight.

-11-

such evidence.

About history, we agree with the State. We simply cannot accept that exit solicitation is so different from the other political conduct highlighted in <u>Burson</u> to compel a different result here. As we see it, commotion tied to exit solicitation is as capable of intimidating and confusing the electorate and impeding the voting process -- even deterring potential voters from coming to the polls -- as other kinds of political canvassing or political action around the polls. This observation seems especially true given the reality that polling places are of such a diverse size and shape, including sometimes using the same doors to enter and exit the polling place, that voters waiting to cast their ballot will often be close to and indistinguishable from voters who have already done so.[13] Although Plaintiffs suggest that election officials can police the polls to ensure that exit solicitation remains peaceful and targets only voters who have already voted, we believe this proposal places too great a burden on those officials to make split-second decisions on who is being solicited, on how they are being solicited, and about what they are being solicited: an invitation to controversy and more disturbances then and there.

---

[13]Plaintiffs even acknowledged in their complaint when they described the method by which they intended to engage in exit solicitation *the difficulty in targeting only those voters who have already voted*: "A petition circulator will stand near the exit to the polling place, in a position to maximize the *likelihood* of interacting with voters who have already cast their ballots . . . ." (emphasis added).

But even in Plaintiffs' imagined perfect world when absolutely only those people who have voted are solicited, our belief does not waiver. The State wants peace and order around its polling places, and we accord significant value to that desire for it preserves the integrity and dignity of the voting process and encourages people to come and to vote. See Buckley v. Am. Constitutional Law Found., Inc., 119 S. Ct. 636, 640 (1999) (acknowledging that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes") (quoting Storer, 94 S. Ct. at 1279); Clean Up '84 v. Heinrich, 759 F.2d 1511, 1514 (11th Cir. 1985) ("We recognize that the state has a significant interest in protecting the orderly functioning of the election process. It must ensure its voters that they may exercise their franchise without distraction, interruption, or harassment."). Given the example of history, if exit solicitation must be allowed close to the polls, it takes little foresight to envision polling places awash with exit solicitors, some competing (albeit peacefully) for the attention of the same voters at the same time to discuss different issues or different sides of the same issue. And we accept it as probable that some -- maybe many -- voters faced with *running the gauntlet* will

-13-

refrain from participating in the election process merely to avoid the resulting

commotion when leaving the polls.[14]

The Burson plurality opinion teaches us that the State need not wait for

actual interference or violence or intimidation to erupt near a polling place for the

State to act.[15]  The State may take precautions to protect and to facilitate voting;

and the pertinent history is broad enough to provide the proof of reasonableness for

a zone of order around the polls.

It is hard for State election officials to know the precise moment just before

solicitation becomes interference in the election process.  And if an election is

disturbed, it is hard to know what the impact was on the election.  The cost of a

disturbed election is too high to allow the State only to react to disturbances but not

to prevent disturbances.  We, therefore, reject the contention that the State must

offer its own evidence demonstrating that the ban on exit solicitation is necessary

---

[14]Indeed, although not necessary to our conclusion, the State produced evidence confirming that many Florida voters have complained that their entrance to and exit from the polls is like "running the gauntlet" and have indicated that "they will no longer participate in elections unless their access to the polls is better protected by the law."

[15]In Burson, the plurality observed that Tennessee had other statutes that made it a crime "to interfere with an election or to use violence or intimidation to prevent voting." Burson, 112 S. Ct. at 1855.  But the plurality recognized that Tennessee's power to protect the voting process was broader than just prohibiting actual interference, violence, or intimidation. Id.  In a similar way, the district court injunction limits the State to prohibiting only conduct that is disorderly, disruptive, or not peaceful; but to ease and to protect voting, the State's legitimate power under the Federal Constitution goes beyond what the injunction would allow the State to do.  The State can do more to restrict political canvassing in a small zone around the polls.  Thus, the injunction cannot stand.

-14-

to serve its compelling interests; our country's long history of election regulation, the consensus emerging from that history, and the practical need to keep voters and voting undisturbed all prove that the ban is warranted.[16]

### 3. Narrowly Tailored

We last explore the breadth of the Florida statute. To prove that the Florida statute is narrowly tailored, the State must show that the Florida Statute is "reasonable and does not *significantly impinge* on constitutionally protected rights."[17] Burson, 112 S. Ct. at 1857 (quoting Munro v. Socialist Workers Party, 107 S. Ct. 533, 537–38 (1986)) (emphasis added in Burson). The Florida statute mirrors in many respects -- including the size of the restricted zone -- the Tennessee statute upheld in Burson. And we conclude that the Florida statute is sufficiently tailored to satisfy the pertinent standard.

---

[16]Many other state legislatures seemingly share the belief that some solicitation-free zone around polling places is necessary to protect voters from confusion and undue influence and to preserve the integrity and dignity of the election process, as other states too have enacted law markedly similar to the Florida statute. See, e.g., Cal. Elec. Code § 18370 (100-foot zone); Colo. Rev. Stat. § 1-13-714 (100-foot zone); Ga. Code Ann. § 21-2-414(b) (150-foot zone); Idaho Code Ann. § 18-2318(1) (100-foot zone); Mass. Gen. Laws ch. 54, § 65 (150-foot zone); Mich. Comp. Laws § 168.744(2) (100-foot zone); Neb. Rev. Stat. § 32-1524(2) (200-foot zone); Utah Code Ann. § 20A-3-501(2)(a) (150-foot zone).

[17]The plurality in Burson cautioned that the modified "burden of proof" applies only where the prohibited activity threatens to interfere with the act of voting itself or physically interferes with voters attempting to cast their ballot. Burson, 112 S. Ct. at 1856 n.11. We believe that exit solicitation of the kind in this case triggers the application of the Burson plurality's standard.

## Conclusion

We accept that the right to engage in political discourse is "the essence of self-government." Garrison v. Louisiana, 85 S. Ct. 209, 216 (1964). But voting is about the most important thing there is. And as history has taught us, the right of political discourse is far from absolute: it must at times step aside so other freedoms similarly pivotal to our republic can thrive. The Florida statute, which balances the right to engage in political speech against the right to vote without interference and harassment, represents one of those times.

We stress the short time (a few days a year) and small area (less than a football field) in which the Florida statute suppresses some political speech around the polls; Plaintiffs are free to solicit signatures unencumbered most days a year and to solicit signatures outside the solicitation-free zone all days a year. And by the way, we are not alone in our decision: other courts, in cases involving petitions, have also upheld statutes establishing solicitation-free zones around polling places.[18] We believe that the sanctity of the voting process and the abuse it has historically faced must allow the Florida legislature to exercise some foresight, to

---

[18]For example, in United Food & Commercial Workers Local 1099 v. City of Sidney, 364 F.3d 738 (6th Cir. 2004), the Sixth Circuit Court of Appeals applied the Burson plurality's standard and affirmed the dismissal of a challenge to an Ohio statute that prohibited solicitation within 100 feet of a polling place. Id. at 748. And earlier, in Schirmer, the Fifth Circuit Court of Appeals, also relying on the Burson plurality's standard, upheld a Louisiana statute that prohibited solicitation about non-ballot issues within 600 feet of a polling place. Schirmer, 2 F.3d at 119.

-16-

take precautions, and to prohibit questionable conduct near polling places before that conduct proves its danger; a compromised election is too great a harm to require otherwise.

We, therefore, conclude today that the Florida statute does not violate the First Amendment by banning Plaintiffs from engaging in exit solicitation about a non-ballot issue within 100 feet of polling places in Florida. Accordingly, the district court abused its discretion in granting Plaintiffs a preliminary injunction.

REVERSED.