TYMKOVICH, Circuit Judge,
concurring in part and dissenting in part:
Tab Bonidy is a licensed gun owner in Colorado who wants to carry his firearm when he picks up mail from a ski town post office. He asserts a right to (1) carry a firearm within the post office itself, or, at the very least, (2) store a gun in his truck in the public parking lot owned by the post office. A federal regulation prevents him from doing either.[1]
Our precedent requires us to apply intermediate scrutiny to this regulation. And I agree with the majority that under intermediate scrutiny the Postal Service’s regulation is valid as applied to gun possession inside the post office, particularly given the Supreme Court’s dicta in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), which deemed regulations of firearms in sensitive places like government buildings presumptively lawful. It is a close call, but Bonidy has on balance not rebutted that presumption.
But the presumption of lawfulness associated with sensitivity does not necessarily hold in the adjacent parking lot. And, to the extent they exist at all, the unique characteristics supporting the regulation’s validity within the post office are far weaker in the parking lot. Accordingly, I disagree with the majority on two points. First, I would explicitly hold in this case that the Second Amendment applies outside the home instead of assuming but not deciding it does, as the majority concludes. My view is that the Second Amendment is not confined to home self-defense, and that conclusion follows naturally from Heller, McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), historical sources, and persuasive circuit cases that have considered the issue.
Second, I would affirm the district court’s invalidation of the regulation as applied in the parking lot. Intermediate scrutiny requires the Postal Service to prove that its regulation prohibiting Mr. Bonidy from storing his gun in a parked car is substantially related to an important government interest. It has not.
Of course I agree public safety — at not too amorphous a level of generality — qualifies as an important government interest. But the government has not shown that successfully combating potential crime at this location — a run-of-the-mill post office parking lot in a Colorado ski town — hinges on restricting the Second Amendment rights of lawfully licensed firearms carriers. Consequently, it cannot possibly show that preventing those individuals from storing their firearms in their cars is substantially related to preventing criminality. Thus, as applied in this case, the regulation restricts far more conduct than is necessary to protect the asserted government interest.
*1130 Because I would AFFIRM the district court’s invalidation of the regulation as applied to the parking lot, I dissent from that part of the majority opinion.
I.

A. The Second Amendment Outside the Home

The Second Amendment protects “the right of the people to keep and bear Arms.” U.S. Const, amend. II. As I read the Supreme Court’s Second Amendment cases, coupled with a review of historical sources, the right extends to self defense outside the home. I would join the Seventh Circuit’s decision in Moore v. Madigan, 702 F.3d 933 (7th Cir.2012), in affirming that principle.[2]
1. Heller and McDonald on the Scope of the Right
Heller and McDonald do not speak directly to whether the Second Amendment right extends beyond the home. But we can answer that question by faithfully applying those opinions and the principles they establish. A fair reading of those opinions admits no other conclusion than that the right to keep and bear arms protects gun owners outside the home. We should address the question directly and provide guidance for our district courts.
Heller explains that the Second Amendment’s meaning and scope flows from the “normal and ordinary” meaning of its words as understood by “ordinary citizens in the founding generation.” Heller, 554 U.S. at 576-77, 128 S.Ct. 2783. At the Founding, Americans understood the right secured by the Second Amendment to be “an individual right protecting against both public and private violence.” Id. at 594, 128 S.Ct. 2783 (emphasis added). The Second Amendment protects the right of self-defense, the need for which is “most acute in the home.” McDonald, 561 U.S. at 767, 130 S.Ct. 3020 (emphasis added) (internal quotation marks omitted). But the Amendment also guarantees the right to “possess and carry weapons in case of confrontation.” Heller, 554 U.S. at 592, 128 S.Ct. 2783. And the founding generation believed the right important for both “self-defense and hunting.” Id. at 599, 128 S.Ct. 2783. Of course, Heller included a list of multiple locations outside the home where some gun restrictions might be “presumptively lawful,” id. at 626, 128 S.Ct. 2783 (listing schools and government buildings), naturally implying that restrictions on free carry in other locations would be granted no such presumption.
Thus, I think it incontestable that the Second Amendment applies outside of home self-defense. Violence occurs outside the home, and to call the need for self-defense most acute in the home is to acknowledge it exists elsewhere. Confrontations do not just occur in the home, and hunting never does. And clarifying the presumptive lawfulness of firearms regulations in schools and government buildings would be unnecessary if the Amendment had no force outside the home. See David B. Kopel, Does the Second Amendment Protect Firearms Commerce?, 127 Harv. *1131 L.Rev. F. 230, 235-36 (2014) (“The exception proves [the] rule.... If the Second Amendment only applied to the keeping of arms at home, and not to the bearing of arms in public places, then there would be no need to specify the exception for carrying arms in ‘sensitive places.’ ”).
The Court’s understanding of the Amendment’s key terms bolsters this conclusion. “Keep arms” means to “have weapons,” and “bear arms” means to “wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.” Heller, 554 U.S. at 582-84, 128 S.Ct. 2783 (alterations in original) (internal quotation marks omitted). Only an unrealistic reading of that language could restrict the right to the home, and it is hard to believe a founding generation who routinely carried weapons for protection outside the home and traveling would agree.

2. The Historical Evidence

To the extent founding-era sources bear on the question, they support this conclusion.
Heller dubbed Blackstone the “preeminent authority on English law for the founding generation.” Heller, 554 U.S. at 593-94, 128 S.Ct. 2783. Blackstone described the right to bear arms as the right of “having and using arms for self-preservation and defence” and the “natural'right of resistance and self-preservation.” Id. at 594, 128 S.Ct. 2783. To be sure, he stressed that the right, like others, may be placed under “necessary restraints” to prevent “what would be pernicious either to ourselves or our fellow citizens.” 1 Commentaries on the Laws of England 140 (1765). But nothing in Blackstone suggests the right is restricted to the home.
And in what Heller called “the most important early American edition of Blackstone’s Commentaries,” Heller, 554 U.S. at 594, 128 S.Ct. 2783, St. George Tucker concluded that “Americans understood the right of self-preservation as permitting a citizen to repe[l] force by force when the intervention of society in his behalf, may be too late to prevent an injury.” Id. at 595, 128 S.Ct. 2783 (quoting 1 Blackstone’s Commentaries 145-46 (1803)) (alteration in original) (internal quotation marks omitted). And, speaking in 1803 of the right to bear arms “recognized and secured in the constitution itself,” Tucker noted that in “many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fíne gentleman without his sword by his side.” Michael P. O’Shea, Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of “Bearing Arms” for Self-Defense, 61 Am. U.L.Rev. 585, 637-38 (2012).
During the founding era, moreover, Americans were no strangers to firearm regulation. Laws “regulated the discharge, storage, and aggressive use of firearms,” and “disarmed people who were considered untrustworthy in some capacity.” Jonathan Meltzer, Note, Open Carry for All: Heller and Our Nineteenthr-Cen-tury Second Amendment, 123 Yale L.J. 1486, 1505 (2014). Yet “there were no direct statutory bans on the carry of arms [outside the home].” Id. at 1499, 1505. Notably, Boston, New York, and Philadelphia all “prohibited the shooting of guns within city limits”- — -further suggesting that carrying firearms outside the home was a background norm. See id. at 1508.
Paired with the language from Heller and McDonald, this historical evidence bolsters the conclusion that the drafters of the Second Amendment enshrined a right extending beyond the home.

*1132
3. Other Circuits

Persuasive recent analyses of the Amendment’s text and relevant history by the Seventh and Ninth Circuits further show that the Amendment protects a right that extends beyond the home. See Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1152-53, 1172 (9th Cir.2014), reh’g en banc granted, 781 F.3d 1106 (9th Cir.2015); Moore, 702 F.3d at 935-36, 942.[3] In Peru-ta, for example, an exhaustive analysis of text and history led the court to conclude that “the carrying of an operable handgun outside the home for the lawful purpose of self-defense ... constitutes bearing Arms within the meaning of the Second Amendment.” Peruta, 742 F.3d at 1166 (internal quotation marks omitted; alterations incorporated). The Seventh Circuit in Moore thought the answer obvious from the Amendment’s plain meaning and avoided a lengthy historical analysis; simply put, the “Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.” Moore, 702 F.3d at 942.
No circuit has held otherwise. With that in mind, I now turn to the permissibility of this regulation.

B. Intermediate Scrutiny

We apply a “two-pronged approach to Second Amendment claims.” Peterson v. Martinez, 707 F.3d 1197, 1208 (10th Cir.2013) (internal quotation marks omitted). First, we ask “whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee.” Id. As the majority assumes (and I would hold), this regulation burdens the right to carry a firearm outside the home. When a burden exists, we “evaluate the law under some form of means-end scrutiny,” id., which requires asking whether an important state “objective is advanced by means substantially related to that objective.” United States v. Reese, 627 F.3d 792, 802 (10th Cir.2010). In light of our past cases, I agree with the majority that intermediate scrutiny is the appropriate form of scrutiny for this regulation.[4] But I disagree with the majority’s conclusion that the ends justify the means in the particular circumstances here.

1. Our Particular Circumstances

In this as-applied challenge, the central issue is whether this regulation is constitutional under the “particular circumstances of the case,” notwithstanding its potential constitutionality in “many of its applications.” United States v. Carel, 668 F.3d 1211, 1217 (10th Cir.2011). A “statute may be invalid as applied to one state of facts and yet valid as applied to another.” Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006). Challenging the enforcement or regulation as to the plaintiff and the particular circumstances implicated is the “hallmark of an as-applied challenge.” Scherer v. U.S. Forest Serv., 653 F.3d 1241, 1243 (10th Cir.2011); see also Citizens United v. Gessler, 773 F.3d 200, 216 (10th Cir.2014) (“Courts can ... recognize the overall propriety of a statutory scheme while still invalidating its application in a specific case.”).
*1133 What are the particular circumstances here? The majority correctly describes some of the relevant circumstances — for example, that valuable items are often shipped through the mail. And the government details at length how criminals have targeted some post offices as well as the administrative benefits the blanket firearms ban provides the Postal Service. But those realities fail to fully address this case’s relevant facts.
A complete view of the facts here considers the restraints this law places on who may carry a firearm and where he may carry it. See United States v. Huitron-Guizar, 678 F.3d 1164, 1166 (10th Cir.2012) (noting that the right to bear arms “is qualified by what one might call the ‘who,’ ‘what,’ ‘where,’ “when,’ and hvhy’ ”). The “who” reveals a regulation that makes no distinction between those that pose heightened security risks and those that do not. As applied here, it burdens the Second Amendment rights of Bonidy and Coloradans like him who have passed a background check and are authorized under state law to carry a concealed handgun. The background check confirms that permit holders have met a laundry fist of minimum standards, including not being subject to any protection order, not having committed perjury in the past, not abusing drugs or alcohol, and not posing a threat to themselves or others. See Colo.Rev. Stat. § 18-12-203. Colorado intended those minimum standards to ensure that concealed carriers were law-abiding, trustworthy individuals.
The “where” is simple: this post office has no security personnel or devices — perhaps understandably, since the government provides no evidence of crime or security threats at this post office. No one suggests that it is an aberration in this respect; it must be one of many post offices posing no unique security threat.[5] Without addressing these relevant facts, the government has not discharged the burden it bears in an as-applied challenge.
Those are the relevant facts. I turn now to the appropriate intermediate scrutiny inquiry, as delineated by our as-applied Second Amendment cases.

2. Our As-Applied Second Amendment Cases

We have not often had occasion to apply intermediate scrutiny to an as-applied Second Amendment challenge. Consequently, our two cases doing so require close attention.
Our first post-Heller case applying intermediate scrutiny was Reese, which addressed an as-applied challenge to 18 U.S.C. § 922(g)(8)’s prohibition on firearm possession for anyone subject to a domestic violence protective order. Reese, 627 F.3d at 799, 801-02. After concluding that intermediate scrutiny applied, we asked whether the government had proven that “its objective [was] an important one and that its objective [was] advanced by means substantially related to that objective.” Id. at 802. No one there questioned the importance of keeping firearms away from domestic abusers, whose high recidivism rate means they pose a heightened risk of violence. The real question was the substantial-relation inquiry.
In that inquiry, we emphasized the need to determine whether the regulation was “substantially related to [its] objective in [Reese’s particular] case.” Id. at 803. Because Reese was subject to a qualifying protective order, prosecuting him was “consistent with the government’s intend *1134 ed purpose in implementing [the] statute.” Id. at 804. That is, we found substantial relation because preventing people of his class (those under domestic-violence protective orders) from possessing guns was precisely the important objective at which the statute aimed.
To be sure, substantial relation does not require every individual in the class to exemplify the important objective. In Huitron-Guizar, for example, we applied intermediate scrutiny to 18 U.S.C. § 922(g)(5)(A), which prohibits unlawfully present aliens from possessing guns. Huitron-Guizar, 678 F.3d at 1169. Crime control and public safety sufficed as important objectives. Id. at 1170.
'We said the statute was substantially related to those objectives, even though it was “surely a generalization to suggest ... that unlawfully present aliens” invariably pose a heightened threat to public safety. Id. We added that “general laws deal in generalities,” and noted our approval of felon-dispossession laws despite the reality that not all felons pose a threat of violence. See id. It was enough that Congress “[might] have concluded” that such aliens posed this danger, id., although none of the opinion’s facts indicated that Huitron-Guizar himself posed that heightened danger.
Thus, Huitron-Guizar reaffirms Reese, but adds another element to our analysis. As in Reese, we rejected Huitron-Guizar’s challenge because preventing people of his class from possessing firearms was precisely the problem the statute aimed to solve. But the case also establishes that we permit prophylaxis. When individuals belong to a group posing a heightened threat to a government interest (like public safety), the government may sometimes apply the statute to them even absent any individualized indication of heightened risk.
Reese and Huitron-Guizar provide one key principle for discerning whether a regulation is “substantially related” in an as-applied Second Amendment challenge: We must ask whether it is “consistent” — in light of the asserted government interest — to apply the regulation to the plaintiffs particular circumstances. Reese, 627 F.3d at 803-04.
To be clear, I do not believe our cases require a substantial relation to each individual plaintiff. That would transform this inquiry into something like a strict scrutiny narrow-tailoring regime. Rather, the proper question is whether the regulation is substantially related to the type of case exemplified by the gun owner’s claim.
That is why, when we examined the substantial-relationship question in Hui-tron-Guizar, we scrutinized the fit of the statute’s generalizations about unlawfully present aliens “as a group.” Huitron-Guizar, 678 F.3d at 1170 (emphasis added). Similarly, in Reese we endorsed the government’s assertion that Reese failed to “demonstrate that he belongs to a sev-erable subcategory of persons as to whom the statute is unconstitutional.” Reese, 627 F.3d at 803-04. Accordingly, a regulation can survive an as-applied challenge even when the plaintiff himself does not pose the threat the regulation aims to solve. Cf. Ward v. Rock Against Racism, 491 U.S. 781, 801, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (noting in the time, place, and manner context that “the validity of the regulation depends on the relation it bears to- the overall problem the government seeks to correct, not on the extent to which it furthers the government’s interests in an individual case”); United States v. Edge Broad. Co., 509 U.S. 418, 430-31, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) (stating courts judge restrictions “by the relation [they bear] to the general problem” posed, not “by the extent *1135 to which it furthers the Government’s interest in an individual case”).
Thus, an as-applied' challenge asks whether it is unconstitutional to apply the law to a particular category of persons. But not every fact of a case defines the category; only facts bearing on the right burdened and the interest pursued shape our inquiry.
Unsurprisingly, therefore, the characteristics of the individual bringing the as-applied challenge — the “who” — carry great' weight, both in defining the relevant category and in determining whether the government may apply the regulation in these circumstances. For example, imagine that Bonidy was arrested during an armed post office robbery. He could not then seriously argue that a statute aimed at preventing gun violence on postal property bore no substantial relation to him and other armed robbers.
Similarly, the characteristics of the location at issue — the “where” — bear on this analysis.[6] A regulation may of course speak generally to a type of property. But the government’s interest may be' unusually weak regarding a particular subcategory of that property- — -it is not enough to say that every government building, lot, . or park will be treated the same. In such a case, we should hesitate before holding a prophylactic general regulation substantially related to its objective.
That location matters to a scrutiny analysis is a familiar part of other areas of constitutional analysis. For example, in First Amendment forum analysis, courts examine a property’s “location and purpose” to determine whether it “constitutes a public forum” and consequently what type of scrutiny to apply. See United States v. Kokinda, 497 U.S. 720, 728-29, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion); id. at 737-38, 110 S.Ct. 3115 (Kennedy, J., concurring) (agreeing that the particular activities taking place on “this postal [property]” bore on whether the property at issue was nonpublic). Consequently, courts may scrutinize two otherwise identical properties differently depending on their location. And in election matters, the courts have little difficulty in giving appropriately increased weight to the fact that a particular regulation only restricts electioneering at or near a polling place. See, e.g., Burson v. Freeman, 504 U.S. 191, 199-200, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion); Minnesota Majority v. Mansky, 708 F.3d 1051, 1055, 1057-58 (8th Cir.2013); Citizens for Police Accountability Political Comm. v. Browning, 572 F.3d 1213, 1215 (11th Cir.2009); Schirmer v. Edwards, 2 F.3d 117, 122-23 (5th Cir.1993).
The same point holds for time, place, and manner restrictions after a forum is deemed “public.” Such restrictions pass muster if they are “justified without reference to the content of the regulated speech,” are “narrowly tailored to serve a significant governmental interest,” and “leave open ample alternative channels for communication of the information.” Rock Against Racism, 491 U.S. at 791, 109 S.Ct. 2746. This tailoring requires the regulation to promote a “substantial government interest that would be achieved less effectively absent the regulation.” Id. at 799, 109 S.Ct. 2746. Consequently, a regulation cannot “regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.” Id. By extension, a regulation would be suspect if, as applied, a substantial portion of its burden on protected rights does not advance its goals because the alleged problem has not been *1136 proven to exist. To be sure, time, place, and manner restrictions require narrow tailoring, not substantial relation. But the principle is what matters — a regulation’s validity is dubious where it is largely futile because the facts do not implicate its asserted objective. Cf. Golan v. Holder, 609 F.3d 1076, 1088 (10th Cir.2010) (concluding, in First Amendment context, that intermediate scrutiny bars content-neutral regulations from “burdening] substantially more speech than necessary to further” government interests).
The importance of the “where” in this case makes it necessary to address Heller’s laundry list of regulations of persons and “sensitive places” that are “presumptively lawful” and subject to permissible Second Amendment regulation. Heller, 554 U.S. at 626-27 & n. 26, 128 S.Ct. 2783. In Heller, the Court explained that the holding did not “cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” Id. at 626-27, 128 S.Ct. 2783. Although we are bound by this recent Supreme Court dicta, see Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1243 (10th Cir.2008), nothing about it ought to short-circuit our analysis of this regulation as applied to this parking lot.
As an initial matter, Heller spoke of “sensitive places,” which could include some parking lots. But most places are “sensitive” for someone. Surely that, without more, cannot categorically justify a firearms regulation in all such places. Such a conclusion would give the government untrammeled power to restrict Second Amendment rights in any place even plausibly considered “sensitive.” Our means/ends analysis requires more, particularly when we consider locations beyond schools and government buildings. By explicitly listing those locations as examples of sensitive places, Heller placed a thumb on the scale in favor of considering them sensitive and thus presumptively regula-ble. See Heller, 554 U.S. at 627 & n. 27, 128 S.Ct. 2783; see also Josh Blackman, The Constitutionality of Social Cost, 34 Harv. J.L. & Pub. Pol’y 951, 986 (2011) (indicating these enumerated locations are “presumptively sensitive”). That thumb on the scale can certainly be overcome depending on the qualities of the particular school or government building.[7] But in considering the parking lot, what matters is that no such thumb on the scale exists *1137 for those locations on which Heller expressed no view. Thus, to be treated as sensitive and consequently presumptively regulable, they must stand or fall on their own.
A few illustrations explain this point. The White House lawn, although not a building, is just as sensitive as the White House itself. Consequently, the presumption of lawfulness for a regulation penalizing firearm possession there might approach the categorical. At the spectrum’s other end we might find a public park associated with no particular sensitive government interests — or a post office parking lot surrounding a run-of-the-mill post office. Perhaps such locations are “sensitive” in the sense that the government always has an interest in protecting its property or visitors. But without more concrete evidence of particular vulnerability, any presumption of lawfulness for a firearms regulation cannot control. One who demonstrates a real burden on his Second Amendment rights in a location that is insufficiently sensitive to justify that burden has rebutted any presumption of lawfulness that could tip the scales against him under our two-prong test.
Thus, Heller’s dicta is consistent with this reality: the generally important government interest of public safety may be more or less critical on the particular facts of an as-applied challenge. And while generalization is permissible, it is less permissible if the government’s interest is weaker in a particular subcategory of cases affected by the regulation. Those principles require invalidating the regulation as applied in the parking lot.

3. Intermediate Scrutiny’s Application to Our Facts

I agree with the majority that public safety on government property is important, and no one disputes the government’s interest in regulating its property in pursuit of that important goal. Thus, I agree that “[t]he government often has more flexibility to regulate when it is acting as a proprietor,” Maj. Op. at 1126, to the degree this simply means that the government’s asserted important interest in such cases may be weightier than when it “regulates private activity unconnected to a government service,” id.[8] Nevertheless,' the baseline intermediate-scrutiny inquiry remains the same, including the requirement of “consisten[cy].” Reese, 627 F.3d at 804. And it is inconsistent to apply this regulation to the subcategory of covered individuals represented here.
First, what is the subcategory? We deal here with lawful concealed carriers who wish to store their firearms in their car in a federal parking lot that poses no unique security or criminality concerns.[9] That appropriately considers the particular circumstances of this case, while remaining focused on the class of cases (rather than *1138 the individual), as we must in an as-applied challenge.
How ean this regulation, as applied to Bonidy, be substantially related to the interest in preventing crime on postal property? Its “consistency” requires assuming that the mere act of carrying a permitted firearm increases the likelihood that one will engage in criminal activities on postal property or otherwise pose a danger. I see no support for such an assumption. And this parking lot’s qualities confirm this regulation’s poor fit. The Avon Post Office parking lot represents a subcategory of post office parking lots implicating no objectives beyond general public safety objectives. To be sure, some of the general justifications for applying this regulation Ce.g., valuables in the mail) apply here— but those justifications are true of all post offices.
If applying this criminality-focused regulation to the subcategory of lawful concealed carriers is dubious, it must be even more dubious to apply it to such a carrier in the subcategory of covered locations posing no particular risk of criminality. As the majority itself notes, the post office has not even found it necessary to “regularly employ any security officers.” Maj. Op. at 1123. The government implies that the location’s specific characteristics are irrelevant. But as-applied challenges require analyzing the case’s particular circumstances, and I cannot see how characteristics unique to this location are any less part of those circumstances than characteristics unique to Bonidy.
Our cases provide a simple limiting principle to my analysis: The government may restrict a class’s Second Amendment rights when its characteristics ' demonstrate a heightened risk of firearm misuse. And because some prophylaxis is permissible, the government may regulate a class member who has not personally demonstrated a higher risk.
Thus, for example, we rejected the as-applied challenge in Huitron-Guizar, because every unlawfully present alien is a lawbreaker, which we held made it reasonable to treat them as posing an elevated risk of criminality. Admittedly, Congress must generalize to conclude that “those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them.” Huitron-Guizar, 678 F.3d at 1170. But that generalization is at least moored to some quality beyond the mere fact of gun ownership that justifies the inference. Reese fits easily into this framework, since anyone subject to a domestic-violence protective order has been determined at some point to pose a heightened risk of violence.
Conversely, because nothing about the Avon Post Office parking lot or Bonidy presents a unique security or criminality risk, the Postal Service can only validate its regulation by asserting that anyone carrying a gun poses a heightened risk of criminality. That cannot be “substantially related” to a blanket prohibition on a fundamental right. It is no answer to say that criminals could rob law-abiding carriers of their guns. That is a possibility, but that is also true of people who possess firearms solely for home defense, and that did not save the regulation in Heller. And I cannot see how a wholesale ban on the exercise of a constitutional right for everyone is substantially related to preventing crime that might occur if criminals robbed some subset of those carriers. The Supreme Court’s instruction in a different context that we should not second guess a decision maker’s choice “concerning the most appropriate method for promoting significant government interests,” Rock Against Racism, 491 U.S. at 800, 109 S.Ct. 2746, does not bar this analysis. I would not second guess the choice; I would evaluate the choice’s scope. Thus, while I *1139 acknowledge that the building’s security is related — perhaps even “integrally,” as the majority posits — to the parking lot’s security, that, without more, does not mean they must be treated identically. It certainly does not mean that if banning Boni-dy from carrying his firearm into the building is constitutional, banning him from storing his firearm in his truck in the parking lot must also be.
I do not mean to discount the concept of permissible generalization. By definition, substantial relation allows some generalization. But when the threat to which generalization allegedly responds is vague and generalized (as the threat of criminality is here, as applied to parking lots posing no particular security risk), less generalization is permissible. We would have a different case if we were dealing with the subcategory of postal parking lots where the government could have (and had) presented particularized information regarding security threats. In such a case, that heightened need might make a prophylactic application of this regulation to a lawful concealed carrier “substantially related.”
At any rate, the ease with which the government could alter this regulation to address its concerns while still respecting the Second Amendment rights of lawful carriers undercuts any substantial-relation argument. As the district court noted, rather than a flat ban on gun storage, the regulation could allow discretionary issuance of permits to “use the parking lot with the gun in a locked vehicle concealed in a glove compartment or console.” App. 924. Such a policy would let the Postal Service control the carrying of firearms in locations where security concerns are indeed so pressing as to make a wholesale ban on firearms “substantially related” to those goals. Of course, a discretionary decision to deny the right on such a basis would be subject to an as-applied challenge. And the Postal Service might well prevail. But it would need to do what it has not done here — demonstrate facts about the location proving that a wholesale ban on temporary car storage of guns is substantially related to public safety.
The majority emphasizes • this regulation’s temporal and geographic limitation. Granted, that limitation makes this restriction less burdensome than one that restricts the right at all times and in all locations for a class of people. But, assuming Second Amendment rights extend outside the home, no one denies this regulation burdens them at least somewhat. That reality moves us to the second part of our two-prong test — the means-end analysis. Temporary or not, the regulation must still be substantially related to the objective. True, the fact that this regulation only burdens the right when citizens enter the limited area of government concern evidences some tailoring. But the foregoing discussion demonstrates its poor fit — one easily rectified — in other areas. Solid tailoring in some respects cannot salve poor tailoring in others.
To be sure, much of this reasoning applies to some degree to the building itself. But, as discussed, there is a key distinction between the building and the parking lot: Heller’s, binding dicta. There is a presumption that this government building is sensitive, which creates a presumption that the regulation within the post office is presumptively lawful. This means, in theory, that arguments sufficient to invalidate a regulation in a non-building location might not suffice to invalidate the same regulation in a building otherwise similar in all material respects. That question need not be decided here, since the government interests are not equally weighty when it comes to physically carrying a firearm into the building versus storing it in the car outside.
In fact, the differences are substantial. The post office is an enclosed space, which *1140 requires patrons to interact in close quarters. Thus, even a lawful use of the firearm for self defense within the building poses greater risks to innocent bystanders than it would in the parking lot. And business involving valuables — a reasonable target for criminals — is transacted within the post office, not in the parking lot. Finally, since the government’s interest in public safety obviously encompasses avoiding accidents, there is a material difference between carrying a firearm on one’s person into the area of - heightened concern and storing it in a less accessible location outside that key area. In sum, given both this government building’s presumptive sensitivity under Heller and the greater generalization permissible in light of the weightier government interests at stake, the regulation passes muster within the post office.[10] This is not to foreclose the possibility that a subcategory of post offices exists in which this regulation would be impermissible. It is only to say that, although a close-call, this post office is not in that subcategory.
Finally, contrary to the majority’s assertions, ' this framework would not require the Postal Service to provide a unique justification for every as-applied challenge to this regulation. Although no two cases are identical, only some differences are relevant. The relevant facts here are (1) that Bonidy is a member of the subcategory of covered individuals that are law-abiding legal firearms carriers, and (2) that the Avon Post Office parking lot is part of the subcategory of covered parking lots posing no uniquely heightened security risk. A decision here would resolve any case with similar facts. And under intermediate scrutiny, a certain degree of prophylaxis remains permissible. For the same reasons, any suggestion that my view would require the Postal Service to “craft different rules for each of its more than 31,000 post offices,” Maj. Op. at 1127, is misplaced.[11] And, in the end, “the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution, for [cjonvenience and efficiency are not the primary objectives — or the hallmarks — of democratic government.” Free Enter. Fund v. Public Co. Accounting *1141 Oversight Bd., 561 U.S. 477, 499, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (alteration in original) (internal quotation marks omitted).
II.
Of course firearms restrictions on government property, in general, bear some relation to the government’s interest in preserving public safety on its property. But our cases require substantial relation. The government presents general information about postal property, which might bear on a facial challenge. Yet it offers no information bearing on the particular facts of this as-applied challenge. And while it undoubtedly matters that the government is acting as proprietor here, I believe the majority incorrectly treats that fact as more or less conclusive. Indeed, the tenor of the majority’s analysis would seem to give the government free rein to restrict Second- Amendment rights based on little more than showing that it owns the property at issue. At the very least, intermediate scrutiny demands more. And while the government’s justifications might suffice to uphold this regulation on rational-basis review, Heller demands more. See Heller, 554 U.S. at 628 n. 27, 128 S.Ct. 2783.
Consequently, I would AFFIRM the district court’s invalidation of this regulation as applied in the parking lot.
Appendix
I find two pictures helpful in visualizing this case. First, I have attached an aerial view of the .Avon Post Office and its parking lot, R., Vol. Ill at 765. Second, I have attached a picture of a post office in Ta-bernash, Colorado — another example of a rural post office with an unsecured parking lot.
*1142 [[Image here]]
*1143 [[Image here]]

. The regulation reads in full: "Weapons and explosives. Notwithstanding the provisions of any other law, rule or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes.” 39 C.F.R. § 232.1(2).

. Of course, as the majority notes, we held in Peterson v. Martinez, 707 F.3d 1197 (10th Cir.2013), that the scope of the right does not include the right to carry a concealed firearm outside the home. Id. at 1209. The proposition I would explicitly decide, rather than assume, is that the more general right to carry a firearm extends outside the home and must be respected by government entities. See Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1172 (9th Cir.2014) (noting that “pre-scrib[ing] a particular manner of carry,” e.g., by “favoring concealed carry over open carry,” does not "offend the Constitution, so long as [the government] allows one of the two”), reh'g en banc granted, 781 F.3d 1106 (9th Cir.2015).

. Although the Ninth Circuit will rehear Peru-ta en banc, the majority opinion’s careful analysis is made no less persuasive by that pending hearing.

. We have generally looked to the restrictiveness of the challenged regulation in determining the appropriate level of scrutiny. Reese, 627 F.3d at 801-02. In both Reese, see id. at 802-04, and United States v. Huitron-Guizar, 678 F.3d 1164, 1169 (10th Cir.2012), we applied intermediate scrutiny to regulations that prohibited firearms at all times and in all locations for an entire group of people.

. Attached as an appendix are two views of rural Colorado post offices that help illustrate their geography.

. Understandably, Reese and Huitron-Guizar do not make this point explicitly, since the regulations in those cases banned firearms in every location.

. This appears to be one point on which I part ways with the majority. Although the list and the facts of this case ultimately lead me to concur in the judgment regarding the post office building, I do not agree that the dicta necessarily means "the Second Amendment right to bear arms has not been extended to 'government buildings.’ ” Maj. Op. at 1123. That overreads Heller s dicta. While the list could certainly mean the right does not extend to schools or government buildings, it could just as easily (perhaps more easily) mean the right extends to those locations but that regulations in those locations presumptively survive scrutiny at step two of our two-prong Second Amendment analysis. ' And the fact that the Heller Court provided its list of exceptions in the course of explaining that the Second Amendment right is subject to certain limitations, see Heller, 554 U.S. at 626, 128 S.Ct. 2783, suggests it describes presumptively permissible limitations on the right, not cases where the right is not burdened at all. See United States v. Chester, 628 F.3d 673, 679 (4th Cir.2010) ("[T]he phrase 'presumptively lawful regulatory measures’ suggests the possibility that one or more of [the] 'longstanding’ regulations 'could be unconstitutional in the face of an as-applied challenge.’ ”) (quoting United States v. Williams, 616 F.3d 685, 692 (7th Cir.2010)). To say the right has not been extended to government buildings is to imply no plaintiff could ever successfully challenge a restriction in any government buildings. That goes too far.

. I part ways with the majority to the extent it implies that the intermediate-scrutiny analysis is somehow looser or more forgiving simply because government-owned property is involved.

. The category cannot simply be anyone carrying or storing a firearm on postal property, as the government hints. After all, this is an as-applied challenge. True, substantial relation to Bonidy himself is not required, and "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.” Doe v. City of Albuquerque, 667 F.3d 1111, 1124 (10th Cir.2012). Nevertheless, the distinction does mean something. We must examine substantial relation to some subcategory of the entire class of potential violators of a regulation. Otherwise, we would transform this "as-applied” challenge into a facial challenge, because the government’s preferred subcategoiy overlaps entirely with the universe of potential violators.

. Of course, every difference just noted also shows why the parking lot is insufficiently sensitive to qualify as presumptively regula-ble. There are surely non-building locations that are sufficiently sensitive to make regulating firearms there presumptively lawful. This parking lot is not one of them. This explains why the majority’s assertion that the sensitive-places language in Heller "applies with the same force to the parking lot as to the building itself,” Maj. Op. at 1125, is not quite on target. To be sure, examining a location's similarity to the enumerated locations of schools and government buildings may aid in determining whether a particular location is "sensitive.” But that means courts should look to how similar the location in question is with respect to its sensitivity, not just its proximity or lack thereof to a government building. For example, it would be odd if a government field otherwise low on the sensitivity scale could be transformed into a location where firearms could be forbidden with little justification by the erection of a public bathroom. Proximity to a government building, without more, cannot be sufficient to exempt a location from the Second Amendment.

. The majority observes that "[Ijocal and state laws do not trump federal laws,” Maj. Op. at 1127, in pointing out that Colorado’s concealed-carry laws do not necessarily give Bonidy an untrammeled right to carry in the state. This is, of course, true. See Heller, 554 U.S. at 626, 128 S.Ct. 2783 (noting the Second Amendment right is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose”). But that is not Bonidy’s claim. He claims not that state laws trump federal laws but that the Second Amendment trumps this federal law.